JANE GOULD MINOT *vs.* SEDGWICK MINOT & others.

Suffolk.    October 2, 1945. — March 4, 1946.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & WILKINS, JJ.

*Equity Pleading and Practice*, Master: recommittal, exceptions to report, report of evidence; Counterclaim; Decree. *Contract*, Validity, By husband and wife, Rescission, Waiver. *Waiver*. *Husband and Wife.* *Trust*, Spendthrift trust; Express trust: what constitutes. *Election*. *Equity Jurisdiction*, Specific performance. *Rules of Court.*

Statement by LUMMUS, J., as to confirmation and recommittal of masters' reports.

An exception to a master's report cannot be sustained except for error apparent on the face of the report.

A party excepting to a master's report was not entitled to recommittal to obtain a summary of evidence under Rule 90 of the Superior Court (1932), refused by the master, by the party's mere assertion, not supported by his affidavit accompanying the motion to recommit, that the objection underlying his exception raised the question whether a certain conclusion was required on the evidence as a matter of law.

Upon appeal from a bare denial of a motion to recommit to a master, with no specific finding as to the truth of an affidavit supporting the motion, this court could not assume its truth, and no error appeared in the denial of the motion.

A summary of evidence under Rule 90 of the Superior Court (1932) is only for the purpose of determining a question of law and may not be used to support an argument as to the facts.

Upon facts found by a master, a certain agreement as to property matters, made in France by husband and wife already separated, was not invalid under the French law on any of the alleged grounds that it was an agreement to effect the separation, or that it was a means of facilitating a divorce later obtained by the wife, or that it improperly sought to affect the right of the parties' children to be supported by both parents and the parents' rights to superintend their maintenance and education.

An agreement by the income beneficiary of a trust "to return" the income to the settlor of the trust would not interfere with the beneficiary's right to receive the income from the trustee nor constitute a transfer of the income to the settlor contrary to a New York statute providing that the "right of the beneficiary to enforce the performance of a trust to receive the income of personal property, and to apply it to the use of any person, can not be transferred by assignment or otherwise."

An attempt by the settlor of a trust to revoke it upon breach by the cestui of a contract, whereby the cestui promised "to return" the

income to the settlor in certain circumstances and the settlor promised not to exercise an apparent right of revocation, showed a mere breach of the contract by the settlor and not an election by him to rescind it for the cestui's breach nor a waiver of the settlor's rights against the cestui under the contract.

In a suit in equity to enforce the defendant's obligation to make certain payments required by the original terms of a contract, a counterclaim to enforce the plaintiff's obligations under a modification of that contract was proper.

In a contract settling the property rights of separated spouses and providing that the husband should pay the wife certain sums periodically "for the maintenance and support of . . . [their] children," the quoted words merely expressed the motive behind the payments and did not impose a trust on the wife with respect thereto.

On a counterclaim whereby the defendant in a suit in equity sought damages for breach by the plaintiff of an agreement to pay over to the defendant the income received from a trust, a final decree should not have included a provision dealing with the payment to the defendant of the income in the future.

BILL IN EQUITY, filed in the Superior Court on May 25, 1937.

The suit was heard by *Greenhalge*, J., on a master's report.

Paragraph 4 of the final decree was as follows: "4. Plaintiff is further ordered and directed to give the United States Trust Company, trustee of said trust fund, a written order to pay over to defendant Sedgwick Minot the income from time to time payable to her from said trust fund, and if the plaintiff at any time should receive income therefrom, she is further ordered and directed to pay over the same to the defendant Sedgwick Minot, within thirty days after its receipt by her, provided that this paragraph of the decree shall be suspended during such time, if any, that payments to her from the Gould Trust, so called, established by the heirs of Charles A. Gould, shall be withheld."

*G. R Farnum*, (*M. Chopnick* of New York with him,) for the defendant Minot.

*D. Burstein*, (*G. J. Dean* of New York with him,) for the plaintiff.

LUMMUS, J. The plaintiff in this bill in equity, filed in the Superior Court on May 25, 1937, was a citizen of the United States domiciled in France. The defendant Sedgwick Minot, hereinafter called simply the defendant (for

the final decree gave no relief against any other parties that had been made defendants) was likewise a citizen of the United States domiciled in France. The plaintiff and the defendant were married on December 27, 1916, in New York, where both were then domiciled, and lived together in New York until December, 1919, when they became domiciled in France. They went to live on an estate bought by the defendant in the Department of Oise, north of Paris. They had three children, born respectively in 1919, 1922, and 1925. They continued to live together in France until the spring of 1925, when the plaintiff went to live with her mother elsewhere in France. In August, 1925, the parties met to discuss their situation, and as a result the separation became permanent. They were divorced by a judgment rendered by the Tribunal Civil de la Seine at Paris on March 17, 1926. The validity of that divorce is not disputed.

This bill in equity was brought in Massachusetts in order to reach funds held for the defendant by fiduciaries here. When the master made his report on June 7, 1943, only one set of fiduciaries remained as defendants. The final decree dismissed the bill as against them, and neither party contends that in that respect the final decree was wrong. The defendant appeared generally and submitted to the jurisdiction of the Massachusetts courts.

The plaintiff seeks relief for breach of a written agreement entered into by her with the defendant in Paris, France, on February 23, 1926. The agreement recited that the parties had permanently separated and wished to settle their property rights. The defendant agreed to establish a trust fund of $50,000 to be held by the United States Trust Company of New York as trustee under the terms of a trust indenture dated and executed by the defendant in Paris on January 18, 1926, but not executed by the trustee in New York until February 26, 1926, under which the income of the trust fund was to be paid to the plaintiff during her life. The plaintiff was to have the custody of the three children until the youngest should arrive at the age of sixteen years, and until that time the defendant

agreed to pay the plaintiff the monthly sum of $625 "for the maintenance and support of said children." Each party released all rights, present and future, in the property of the other, arising out of the matrimonial relation. In the event of divorce, the defendant was to continue payments under the agreement, but the plaintiff was to claim no alimony. Then followed a provision that the contract was to be governed by the laws of New York.

On April 17, 1942, the case was referred to a master under the form of rule set forth in Rule 86 of the Superior Court (1932) "to hear the parties, find the facts and report his findings to the court, together with such questions of law, arising in the course of his duty, as any party may request." The master filed his report on June 7, 1943. The defendant seasonably brought in thirty-three objections which were appended to the report, and as provided in Rule 90 of the Superior Court (1932) requested the master in writing to "append to his report, for the sole purpose of enabling the court to determine" the questions of law presented by certain of the objections, "a brief, accurate and fair summary of so much of the evidence as shall be necessary for such purpose," with respect to the objections numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 16, 20, 21, 22, 24, 27 and 30. The master reported what purported to be such a summary, except as to some objections that he deemed outside the requirement of Rule 90 as to summaries. The defendant moved to recommit the report with directions to report other and further evidence by way of summary, accompanying his motion by a supporting affidavit under Rule 46 of the Superior Court (1932). He also moved to recommit with directions to report other and further facts. The judge denied the motion to recommit "in the exercise of such discretion as I have in the premises," but sustained exceptions numbered 14 and 15 relating to an arrangement made at Lausanne as described in paragraphs numbered 21 and 22 of the report. The master's report as modified by the sustaining of those exceptions was confirmed, the other exceptions being thus impliedly overruled. The defendant appealed from the denial of

his motion to recommit, and from the overruling of most of his exceptions and the confirmation of the report. The plaintiff appealed from the sustaining of exceptions numbered 14 and 15. The final decree gave damages to each party, and ordered the plaintiff to pay the balance which was against her. Both parties appealed from the final decree.

Before we can discuss the questions of fact and law arising on the report, we must disentangle the facts found from any asserted facts and evidence that we have no right to consider upon the merits of the case.

In dealing with a master's report and the exceptions [1] that automatically and impliedly result from objections to it duly brought in to the master and appended to his report (Equity Rule 26 [252 Mass. 608]; Rule 90 of the Superior Court [1932]; *Respro, Inc.* v. *Worcester Backing Co.* 291 Mass. 467, 471, 472; *Meehan* v. *North Adams Savings Bank*, 302 Mass. 357, 362), one elementary rule is that a master's report has no effect until confirmed. *Meehan* v. *North Adams Savings Bank*, 302 Mass. 357, 362. *Malden Trust Co.* v. *George*, 303 Mass. 528, 529. A judge ought not to confirm it until satisfied that it affords a fair and adequate basis for a decree on the merits. Sometimes, it is true, parties seek unreasonable refinement in analysis of the facts, which, if ordered, would lead only to confusion. *MacLeod* v. *Davis*, 290 Mass. 335, 338. But

---

[1] Exceptions in equity, of which exceptions to a master's report constitute the most common but not the only example (*O'Brien* v. *Keefe*, 175 Mass. 274; *Indrisano's Case*, 307 Mass. 520), are not to be confused with statutory exceptions under G. L. (Ter. Ed.) c. 231, §§ 113, 144, which originated in law actions but have long extended to equity cases as well. *Indrisano's Case*, 307 Mass. 520, 522. Those statutory exceptions reach nothing but errors of law, even in equity cases. *Dorr* v. *Tremont National Bank*, 128 Mass. 349, 354, 357. *Kennedy* v. *Welch*, 196 Mass. 592, 594. *Bartley* v. *Phillips*, 317 Mass. 35, 42, 43. But they reach errors not appearing upon the record until a bill of exceptions has been allowed to make them a part of the record.

Exceptions to master's reports often are addressed to alleged errors of fact. For examples, see *Handy* v. *Miner*, 265 Mass. 226, 228; *Epstein* v. *Epstein*, 287 Mass. 248, 254; *MacLeod* v. *Davis*, 290 Mass. 335, 337; *Carilli* v. *Hersey*, 299 Mass. 139, 143; *Nelson* v. *Bailey*, 303 Mass. 522, 527; *Frawley* v. *Forrest*, 310 Mass. 446, 456. A question whether an inference or conclusion of fact drawn by a master from subsidiary findings is proper requires no exception in order to raise it. *United States Fidelity & Guaranty Co.* v. *English Construction Co.* 303 Mass. 105, 111, 112. *Ferrone* v. *Rossi*, 311 Mass. 591, 595. *Distasio* v. *Surrette Storage Battery Co.* 316 Mass. 133, 135. But an exception often is used to raise such a question.

it was said in *Dodge* v. *Anna Jaques Hospital*, 301 Mass.
431, 436, and repeated in substance in *Kahn* v. *Pacific
Mills*, 311 Mass. 588, 589, 590, that "a master owes a duty
to the parties, when making ultimate findings upon vital
points, to find and report the subsidiary facts upon which
they are based and to state that they are so based." If
a report appears inadequate, lacking in analysis of vital
points, or otherwise unsatisfactory, a judge may recommit
the report with directions to make additional findings,
to report all the evidence or the evidence upon specified
points (*Morin* v. *Clark*, 296 Mass. 479, 483; *Spiegel* v.
*Beacon Participations, Inc.* 297 Mass. 398, 406, 407), or
to report all the evidence or subsidiary findings upon which
a specified conclusion of fact was based (*Wilson* v. *Jones*,
280 Mass. 488, 492, 493; *George C. Miller & Co. Inc.* v.
*Beagen*, 293 Mass. 54, 57; *Lawrence* v. *Houghton*, 296
Mass. 407, 408), whereby the propriety of particular find-
ings or conclusions may be tested. All this may be done
by a judge sua sponte, or on motion of a party. *Cutter* v.
*Arlington Casket Co.* 255 Mass. 52, 57. *Watkins* v. *Simplex
Time Recorder Co.* 316 Mass. 217, 224. A judge may even
vacate the rule to a master, and hear the evidence himself
or refer the case to a different master. Action in all these
matters requires a high degree of legal acumen and judicial
wisdom, for it rests in the discretion of the judge and seldom
can be revised on appeal. *Budris* v. *New Amsterdam Casu-
alty Co.* 292 Mass. 46, 50. *George C. Miller & Co. Inc.* v.
*Beagen*, 293 Mass. 54, 57. *Krauss* v. *Kuechler*, 300 Mass.
346, 348, 349. *Bumpus* v. *Church*, 302 Mass. 419, 420.
*Anderson* v. *Connolly*, 310 Mass. 5, 10. *Kahn* v. *Pacific
Mills*, 311 Mass. 588, 590. *Leventhal* v. *Jennings*, 311 Mass.
622, 623. *Cappy's Inc.* v. *Dorgan*, 313 Mass. 170, 173,
174. *Bouchard* v. *Bouchard*, 313 Mass. 531, 534. *Buckley*
v. *John*, 314 Mass. 719, 725.

Another elementary rule is that an exception to a master's
report cannot be sustained unless his error is demonstrated
upon the face of his own report. [1] Such an exception can-

---

[1] "An exception to a master's report in equity . . . is the act of appeal-
ing from rulings appearing of record, and nothing more." *O'Brien* v. *Keefe,*
175 Mass. 274, 276.

not be supported by assertions of counsel, by statements in affidavits, or by evidence introduced before the judge. *Israel* v. *Sommer,* 292 Mass. 113, 120. *Anderson* v. *Connolly,* 310 Mass. 5, 10, 11. *Leventhal* v. *Jennings,* 311 Mass. 622, 624. *Cappy's Inc.* v. *Dorgan,* 313 Mass. 170, 173. *Carroll* v. *Hinchley,* 316 Mass. 724, 728. For this reason, if for no other, an exception based upon the failure of a master to find certain facts upon unreported evidence is worthless. *Manfredi* v. *O'Brien,* 282 Mass. 458, 460. *Carleton & Hovey Co.* v. *Burns,* 285 Mass. 479, 483, 484. *Morin* v. *Clark,* 296 Mass. 479, 484. *Markey* v. *Smith,* 301 Mass. 64, 74. *Anderson* v. *Connolly,* 310 Mass. 5, 10. *Milbank* v. *J. C. Littlefield, Inc.* 310 Mass. 55, 59. *Leventhal* v. *Jennings,* 311 Mass. 622, 624. *Cappy's Inc.* v. *Dorgan,* 313 Mass. 170, 173, 174. *Buckley* v. *John,* 314 Mass. 719, 725. *Carroll* v. *Hinchley,* 316 Mass. 724, 728.

Rule 90 of the Superior Court (1932) provides the only means by which an excepting party as of right may obtain any summary of evidence. *Buckley & Scott Utilities, Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 507, 508. *Bouchard* v. *Bouchard,* 313 Mass. 531, 534. The purpose of requiring a summary was to remove an anomaly, of infrequent practical importance (but see *Meehan* v. *North Adams Savings Bank,* 302 Mass. 357, 364, 365), by which findings of a master unwarranted by the evidence were more difficult to attack than the similar findings of a judge. *Morin* v. *Clark,* 296 Mass. 479, 482. The rule makes the right to a summary depend, among other things, upon a written request for a summary relative to an objection raising a question that "depends upon evidence not reported" (*Watkins* v. *Simplex Time Recorder Co.* 316 Mass. 217, 222), which question is not one of fact, but one of law (*Milbank* v. *J. C. Littlefield, Inc.* 310 Mass. 55, 59, 60; *Buckley & Scott Utilities, Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 507, 508; *Buckley* v. *John,* 314 Mass. 719, 724) which the master must decide in the course of his duty rather than one for the judge upon the facts reported by the master. *Buckley & Scott Utilities, Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 507, 508. *General Outdoor Advertising*

*Co. Inc.* v. *Department of Public Works,* 289 Mass. 149, 203.

In the present case many of the exceptions take the point that on all the evidence some affirmative defence has been established as matter of law. The master refused to report a summary of evidence upon the objections that gave rise to those exceptions. Obviously the existence of any genuine and substantial question of law of that sort is most unlikely, and has not been made to appear even by the affidavit which accompanied the defendant's motion to recommit for the purpose of causing a summary to be reported. A party cannot convert a question of fact into one of law by merely asserting that certain conclusions are required by the law, and thus cause practically all the evidence in the case to be summarized and reported. We find no error in the denial of the motion to recommit as to this matter.

As to other exceptions the master did report a summary of the evidence, but the defendant contends that the summary was not such as the rule requires. His remedy was to move to recommit the report with directions to report a proper summary. That remedy he adopted, and to ensure a hearing he should have supported his motion by affidavit showing what would be a proper summary, which affidavit would be evidence before the judge. Rule 46 of the Superior Court (1932) (compare Common Law Rule 11 [252 Mass. 592]). *Nagle's Case,* 310 Mass. 193, 198. *Pearson* v. *Mulloney,* 289 Mass. 508, 513. *Morin* v. *Clark,* 296 Mass. 479, 483, 484. *Markey* v. *Smith,* 301 Mass. 64, 75. *Wilbur* v. *Newton,* 302 Mass. 38, 45. *Chopelas* v. *Chopelas,* 303 Mass. 33, 36. *Anderson* v. *Connolly,* 310 Mass. 5, 10. *Leventhal* v. *Jennings,* 311 Mass. 622, 623. See also *Coughlin* v. *McGrath,* 295 Mass. 499, 504; *Commonwealth* v. *Millen,* 290 Mass. 406, 410; *Nicoli* v. *Berglund,* 293 Mass. 426, 429. We pass by the question whether the affidavit which accompanied his motion was sufficient in form where it did not show precisely what would be a proper summary but merely set forth evidence alleged to be "material." Even if the affidavit was in proper form, on appeal from the denial of the motion to recommit the appellant must show error

upon the face of the record. The bare denial of such a motion, as in this case, without any express finding that the affidavit is either true or untrue, does not enable this court on appeal to assume its truth. *Commonwealth* v. *Millen,* 290 Mass. 406, 410. *Carilli* v. *Hersey,* 300 Mass. 329, 331. *Kahn* v. *Pacific Mills,* 311 Mass. 588. *DeLuca* v. *Boston Elevated Railway,* 312 Mass. 495, 499, 500. Upon the record before us, no error in the denial of the motion to recommit for a further or better summary is shown. In other respects the granting or denial of the motion to recommit was wholly discretionary.

As to the exceptions to the master's report, many of them are worthless under principles already stated. Among those are exceptions to the failure to find other or further facts. Some exceptions take the point that certain findings as to a transaction at Lausanne were in law unwarranted by the evidence. With respect to those exceptions the master reported a summary of evidence. The defendant argued against those findings on the ground of their alleged inconsistency with subsidiary findings, but did not argue that they were unwarranted upon the summary of evidence reported. We find no error in the action of the judge upon any of the exceptions.

In adopting Rule 90, the Superior Court realized that a party obtaining a summary of evidence supposed to be needed for the determination of some alleged question of law might be tempted to use it in argument upon the facts. Such a use, even if tolerated, would usually prove futile, because the summary would seldom be a complete statement of the evidence bearing on a fact. *Rosman* v. *Rosman,* 302 Mass. 158, 160. *Wadsworth* v. *Richenburg,* 303 Mass. 548, 550. *Gordon* v. *Guernsey,* 316 Mass. 106, 108. But the rule declares that a summary is "for the sole purpose of enabling the court to determine such question of law," and plainly forbids any attempt to use it for any other purpose. *Morin* v. *Clark,* 296 Mass. 479, 483. *Meehan* v. *North Adams Savings Bank,* 302 Mass. 357, 362. *Wadsworth* v. *Richenburg,* 303 Mass. 548, 550. *Buckley & Scott Utilities, Inc.* v. *Petroleum Heat & Power Co.* 313 Mass. 498, 507, 508.

Now that the underbrush has been cleared away, the substantial questions in the case can be seen. In considering those questions, we must ignore the summaries of evidence as well as the affidavits.

If the written agreement of February 23, 1926, is governed, as it says it shall be, by the law of New York, no reason appears why it should be held illegal. In New York a husband can contract with his wife. *Charney* v. *Charney*, 316 Mass. 580, 581, and New York cases cited. The defendant contends, however, that its validity must depend on the law of France where the parties were domiciled.

His first contention is that it is invalid because a part of a collusive arrangement for the obtaining of a divorce upon manufactured grounds. But the defendant, who has married again on the strength of the divorce, joins the plaintiff in admitting the validity of the divorce. When the agreement of February 23, 1926, was made, the parties had been separated for some months. The master found that at that time "the separation had already become permanent, and the plaintiff had determined to apply for divorce, for which she believed that she had or could establish a good cause." That agreement, and the establishment of the $50,000 trust fund, he found, "in no way caused or induced the separation or the divorce which followed." The agreement merely provided for the support of an already disrupted family. It was in no way conditional upon divorce, but was to be valid whether a divorce followed or not. The master found that the divorce was not collusive or based upon untrue grounds. These views were supported by the testimony of two experts in French law produced by the plaintiff, although another produced by the defendant disagreed.

These findings are not inconsistent with the subsidiary finding that the parties were already permanently separated when at the outset of the divorce proceedings the plaintiff caused a formal demand to be made upon the defendant by an officer, demanding that he receive her back as a wife, which demand the defendant refused in what he calls

such "suitably 'insulting' terms" as to constitute "injures graves," the ground upon which the divorce was granted. See *MacLeod* v. *Davis*, 290 Mass. 335, 337, 338; *Kasper* v. *H. P. Hood & Sons, Inc.* 291 Mass. 24; *Watkins* v. *Simplex Time Recorder Co.* 316 Mass. 217, 224; *Gadreault* v. *Hillman*, 317 Mass. 656, 660. Only a few months before the formal demand, the plaintiff had expressed to the defendant her wish to resume full matrimonial relations, and the defendant had insisted upon continuance of their separation. It was only after normal married life was refused by the defendant that the plaintiff decided to apply for divorce. Upon these facts we think that the proper conclusion is that the formal demand was not a mere tactical pretence, but represented her real state of mind, which should be found to have continued ever since she had asked the defendant to resume married life a few months before, and none the less though she might have expected the second rebuff that under French law could be found to constitute "injures graves."

The master found in favor of the defendant that any agreement to effect a separation, and to fix the financial and other conditions of separation, without legal proceedings, is illegal and void under French law, as is an agreement to consent to a divorce, even one for which lawful ground exists. But he found that the written agreement of February 23, 1926, was not the purchase of consent to a divorce or a means of facilitating the obtaining of a divorce, nor an agreement in violation of art. 307 of the French Civil Code which provided that separation from bed and board "cannot be effected by the mutual consent of the husband and wife."[1] The agreement of February 23, 1926, did not effect or perpetuate any separation. It dealt with property rights independently of separation. We find no error in the finding that the agreement did not violate art. 307.

---

[1] Cachard, French Civil Code (Rev. ed. 1930). In Wright, French Civil Code (1908), the translation reads, "Parties cannot obtain a separation by mutual consent." The original French text is "elle [i.e. a judicial separation, or "séparation de corps"] ne pourra avoir lieu par le consentement mutuel des époux." Carpentier, Codes et Lois (1897).

The defendant further contends that that agreement violated art. 303 of the French Civil Code, which provided that "Whoever may be the person to whom the children are confided, the father and mother shall respectively retain the right to superintend the maintenance and the education of their children, to which they shall be obliged to contribute in proportion to their means." [1] The agreement prescribed payments to be made by the defendant to the plaintiff for the support of the children. It did not absolve the plaintiff from any duty to support them. It did not and could not affect the right of the children to be supported by either parent or by both parents, or the right of both parents to superintend the maintenance and education of the children. The master found that the agreement in question was valid under French law but that it could be revised for the future by the judgment of a court. In the divorce proceeding the French court was informed of the existence of the agreement and noted in its record that the parties "have agreed upon the custody of the children and their respective rights to visit them." If such an agreement violated French law the court would hardly have accepted it in that way. In the agreement the plaintiff, as the defendant points out, agreed not to claim alimony, but that meant support for herself, not support for the children. The master rightly found upon the testimony of experts in French law that an agreement for the support of children of separated parents is valid if the amount is adequate, as the amount in this case is agreed to have been. We find no error in his finding that the agreement of February 23, 1926, is valid against all objections. Although the defendant suggests rather feebly that we should presume that in France as in Massachusetts a contract between husband and wife is void, none of the experts took any such position, and the mass of French authority before the master shows that there is no such principle in the law of France. French law requires no consideration in the common law sense in order to create a contractual obligation,

---

[1] Cachard, French Civil Code (Rev. ed. 1930). The translation in Wright, French Civil Code (1908) is not materially different.

and the required "cause" is deemed to exist until its absence is proved. [1]

It is undisputed that the defendant did not perform his agreement to pay the plaintiff $625 a month for the support of the children. Accordingly the plaintiff was entitled to damages for the breach of that agreement.

The defendant by a counterclaim set up (a) an agreement by the plaintiff to pay over to him all the income of the $50,000 trust, and (b) a diversion by the plaintiff from the support of the children and a misappropriation by her to her own use of much of the money paid her by the defendant for the support of the children.

When the $50,000 trust fund was created, the plaintiff was hopeful of obtaining money from the estate of Charles A. Gould, her grandfather, the father of her deceased father. The grandfather had died in New York on January 6, 1926, leaving a large estate.

In the instrument creating the $50,000 trust, which the defendant executed on January 18, 1926, and the trustee executed in New York on February 26, 1926, he made the following reservation: "It is further understood and agreed that, in case the said Jane Gould Minot should receive during her lifetime from the estate of her grand-father, Charles A. Gould, deceased, an amount exceeding One Hundred and Fifty Thousand Dollars ($150,000) net of all taxes, fees and expenses, the party of the first part [the defendant] expressly reserves to himself the right to revoke this trust agreement entirely by an instrument in writing under his own hand and duly acknowledged so as to authorize it to be recorded."

By his will Charles A. Gould bequeathed to the plaintiff's mother nothing and to the plaintiff only $100. But a threatened contest of the will was compromised by the residuary legatees by their creating on December 4, 1926, out of money distributed to them under the will, a trust fund of $300,000, the income of which was to be payable to

---

[1] Cachard, French Civil 'Code (Rev. ed. 1930) art. 1131. Wright, French Civil Code (1908) art. 1131. Amos & Walton, Introduction to French Law (1935) 162, 165.

the plaintiff and her mother during their lives with remainder to the issue of the plaintiff. Income from that trust has been paid to the plaintiff ever since April 8, 1927. The defendant took the position that the creation of that trust brought into operation the reserved right of the defendant to revoke the $50,000 trust. Ultimately that question was presented to the courts of New York, and the decision was that the defendant could not revoke the $50,000 trust under his reserved power because the money put into the $300,000 trust was not received "from the estate of" Charles A. Gould. *United States Trust Co.* v. *Minot*, 255 App. Div. (N. Y.) 769, affirmed 280 N. Y. 746. But that litigation was not ended until 1939 and in the early part of 1926 the plaintiff was in accord with the defendant's contention that legally or morally the defendant was entitled in some manner to regain the income of the $50,000 trust, because the plaintiff had been provided for by the $300,000 trust as well as had been contemplated when the $50,000 trust was created.

The defendant obtained the plaintiff's consent to the revocation of the $50,000 trust, and on March 20, 1926, the defendant undertook to revoke it. But the trustee was of the opinion, which turned out to be correct, that the defendant had no right to do so, and refused to recognize the revocation. In May or June, 1926, the plaintiff expressed her willingness to pay over to the defendant the income from that trust, since it could not be revoked. The master finds, however, that no contract was made between them at that time, and we see nothing in the record to show that he was wrong. But later, about July 1, 1927, the defendant saw the plaintiff at Lausanne in Switzerland where she was temporarily visiting her mother. After some discussion, both parties signed the following document which was written by the plaintiff: "I agree to return to Sedgwick Minot the income from the [$50,000] trust fund that he established for me when I receive payment from the [$300,000] Gould Trust. But it is understood that if for any reason that may be those payments are discontinued I will keep the money from the trust fund

established by Sedgwick Minot." The word "when" in the document evidently should be read "while," for the plaintiff had already begun to receive payments from the Gould trust. That arrangement was more favorable to the plaintiff than a revocation of the $50,000 trust would have been, because her renunciation of the income was conditional, and the preservation of the trust protected the remainder interest of her children. But it enabled the defendant to recapture the income of the $50,000 trust. The defendant at the same time, the master found, agreed orally not to seek to revoke the $50,000 trust and not to interfere with the payment of the income from it to the plaintiff. He ceased his efforts in both directions, and payments to her of the income, which he had caused to be stopped, were resumed immediately and continued until the question of revoking the trust was brought up by him again in December, 1932, when litigation was begun in the New York courts to determine his right to revoke it. The plaintiff on her part turned over to the defendant the income of the $50,000 trust as it was received from the trustee until the spring of 1928 when she ceased to do so.

Nothing in the summary of evidence reported shows that the findings of the master as to the transaction at Lausanne were unwarranted by the evidence as matter of law. No subsidiary finding is so inconsistent with the conclusion that mutual contracts, each in consideration of the other, were made at Lausanne, that the master's conclusion cannot stand. The plaintiff suggests that there was no evidence of the law of Switzerland with respect to the validity of these mutual contracts. The parties were no longer married; but, if they had been, a contract between spouses appears to be valid by the laws of France, Switzerland and New York. For the law of Switzerland, see Williams, Swiss Civil Code (1925) § 177; Shick, Swiss Civil Code (1915) § 177. The "cause" which is presumed to exist under French law is not required at all for the creation of a contractual obligation under Swiss law. Lorenzen, 28 Yale Law Journal 621, 642. Wettstein, Swiss Federal Code of Obligations (1928), especially § 3. The

mutual contracts appear to have been valid under the law of Switzerland where they were made and under the law of France where the parties lived and where the contracts were to be performed.

The plaintiff contends that her contract to pay over the income of the $50,000 trust was invalidated by § 15 of the New York personal property law, (N. Y. Consol. Laws, c. 42) which provides that the "right of the beneficiary to enforce the performance of a trust to receive the income of personal property, and to apply it to the use of any person, can not be transferred by assignment or otherwise." But even if the New York law had any application to a promise by a resident of France with respect to her disposition of income after its receipt by her in France, the New York statute was not violated. The income was not "transferred" to the defendant contrary to the New York statute. As the City Court of New York said in a well reasoned opinion in the similar case of *Bursch* v. *Bursch*, 82 N. Y. L. Jour., 2426 (February 13, 1930), "There is no disturbance of the right of the beneficiary to receive the income from the trustee. The right to enforce the trust still remains with the cestui que trust." See also *In re Oakley's Estate*, 116 Misc. (N. Y.) 494. What the New York statute does is to convert every trust within its scope into a sort of spendthrift trust. Even in a spendthrift trust the beneficiary is free to dispose of the income once it reaches his hands. Am. Law Inst. Restatement: Trusts, § 152, comment j.

From what has already been said, it appears that the plaintiff violated the Lausanne agreement first in 1928, when she failed to pay over to the defendant the income of the $50,000 trust. Instead of suing her for her breach of contract, the defendant waited until late in 1932, when he caused proceedings to be begun in New York to determine the validity of his attempted revocation of that trust. If that was merely the common case of an election of remedies, the fact that he chose a remedy that turned out not to exist would not prevent his subsequent resort to the right remedy by claiming damages for the plaintiff's

breach of contract. *Snow* v. *Alley*, 156 Mass. 193. *Miller* v. *Richards*, 305 Mass. 424, 426. His delay did not constitute a waiver, for it did not show "the intentional relinquishment of a known right." *Niagara Fire Ins. Co.* v. *Lowell Trucking Corp.* 316 Mass. 652, 657. On a number of occasions he demanded payment of the income. But the plaintiff contends that by seeking in 1932 to revoke the $50,000 trust contrary to his promise, the defendant must be considered as rescinding the entire Lausanne agreement because of the earlier breach by the plaintiff, with the result that the plaintiff could not be held in damages for her earlier breach. The plaintiff contends that this case presents an election, not merely of remedies, but of substantive rights, and that the election was complete and conclusive as soon as the defendant attempted to revoke the $50,000 trust in contravention of his promise not to do so, without regard to his failure to effect a revocation. See Am. Law Inst. Restatement: Contracts, § 381, comment d; Williston, Contracts (Rev. ed. 1937) §§ 1527–1528A. The master ruled in accordance with the plaintiff's contention, saying, "I reach this conclusion whether I apply common law principles, the law of Switzerland (Swiss Civil Code of Obligations, § 107 [1]) or the law of France (French Civil Code, art. 1184 [2])." By sustaining exceptions numbered 14 and 15 the judge reversed the ruling of the master, and ruled that the defendant was not precluded from seeking damages from the plaintiff for her breach of the Lausanne agreement.

---

[1] "Where in the case of bilateral contracts a debtor is in default, the creditor is entitled to give him a reasonable time limit for subsequent performance or to have such time limit fixed by the competent authorities. In default of performance within such time limit, the creditor may still sue for performance and damages for delay, but in lieu thereof, he may, if he gives immediate notice to that effect, forego subsequent performance, and at his option, either claim damages for non-performance or withdraw from the contract." Wettstein, Swiss Federal Code of Obligations (1928) § 107.

[2] "The law always implies a condition dissolving the contract in the case of bilateral contracts when one of the parties does not fulfil his engagement. In such a case the contract is not dissolved ipso facto. The party who complains that the other party has not fulfilled his engagement to him has the option of either forcing him to fulfil his contract (when that is possible) or of insisting upon the contract being dissolved with damages and interest. The dissolution of the contract must be claimed from the court. The court may give the defendant time if it thinks the circumstances warrant it." Wright, French Civil Code (1908) art. 1184.

We think the judge was right. The attempt by the defendant to revoke the $50,000 trust, though a breach of the Lausanne agreement, was not the exercise of any right or election existing under or by virtue of that agreement. If he had any right to revoke, it was by virtue of the reserved power in the trust instrument. His attempt was a breach of the Lausanne agreement, but not the taking of any position with respect to its continuing validity. Cases occur where each party to a contract violates it and each is liable in damages to the other. Am. Law Inst. Restatement: Contracts, § 357 (1), comment a. Williston, Contracts (Rev. ed. 1937) § 812 et seq. *Boston Blower Co.* v. *Brown,* 149 Mass. 421. *Wiley* v. *Athol,* 150 Mass. 426. *National Machine & Tool Co.* v. *Standard Shoe Machinery Co.* 181 Mass. 275, 279. *International Textbook Co.* v. *Martin,* 221 Mass. 1. *Connolly* v. *Haines-Ce Brook Inc.* 277 Mass. 423, 427. *Lander* v. *Samuel Heller Leather Co. Inc.* 314 Mass. 592, 598. The present case seems to be of that sort. There is nothing to show that the defendant intended to waive his rights against the plaintiff arising from the Lausanne agreement, or to do anything more than violate it on his own part. He was not bound to treat the plaintiff's breach as a rescission, even if entitled to do so. We see nothing in either the Swiss Federal Code of Obligations or the French Civil Code that conflicts with our position.

The plaintiff contends that the claim of the defendant was not properly asserted by a counterclaim under Rule 32 of the Superior Court (1932). The counterclaim, whether equitable or legal in its nature, arose "out of the transaction which is the subject matter of the suit," namely, the written agreement of February 23, 1926, as modified by the Lausanne agreement, which settled the property rights of the separated or divorced spouses. In our opinion the counterclaim was proper.

Even if under French law the money owed by the parties to each other was in law set off by a principle called "compensation" as soon as their respective obligations became payable (French Civil Code, arts. 1234, 1289, 1290; Willis-

ton, Contracts [Rev. ed. 1936] §§ 887E, 921A; see also Swiss Federal Code of Obligations, §§ 120, 124, 125), the record affords no basis for computing the liabilities of the parties upon that theory, if indeed such liabilities would vary materially from their liabilities computed according to the common law. The plaintiff, who raised this question, failed to show any practical harm to her by the course that was adopted, and failed by exception, motion to recommit, or other action except her appeal from the final decree, to make any effort to lay any foundation for a determination of the rights of the parties on the theory of compensation or set-off under French law. Under these circumstances she fails to show any harmful error in the course adopted by the master and approved by the judge.

In his answer the defendant asserted as a second ground of counterclaim that the payments made by the defendant of $625 a month under the written agreement of February 23, 1926, "were received in trust for the sole and express purpose of application to the maintenance and support of said children," and that the plaintiff had diverted to her own use large parts of such payments. He prayed for an accounting and the repayment of such parts to the defendant, since all the children have become sixteen years of age. "This matter was mentioned by counsel for the defendant in his opening statement at the beginning of the hearings before . . . [the master] but was not again brought to . . . [his] attention until" after the evidence had been concluded. "No evidence whatever was introduced by either party as to the use made by Mrs. Minot of the sums paid to her under this agreement. It is undisputed that the children were in her custody during the whole period covered by the agreement, that they lived with her most of the time and that she provided their maintenance and support." The defendant raised the question by his exception numbered 16, which caused a slight change in the findings. But the record contains nothing to show that the second ground of counterclaim was based on anything substantial, or was other than a fishing expedition. Besides,

trusts are unknown to French law, and we are inclined to think that the plaintiff took the monthly payments in her own right, not in trust, and that the words in the written agreement "for the maintenance and support of said children" expressed the motive behind the payments rather than an enforceable obligation attaching to them. It is a contract, not a will, that we are construing, and it is hardly likely that the parties intended to create a new and fruitful source of litigation. See *Cormier* v. *Hudson*, 284 Mass. 231, 235; *Equitable Trust Co.* v. *Rochling*, 275 U. S. 248, 253; *Wilkinson* v. *Chambers*, 181 Penn. St. 437. We think the decree was right in ignoring and thereby impliedly dismissing (*Rubenstein* v. *Lottow*, 220 Mass. 156, 161) that counterclaim.

No dispute of any consequence arises as to the computation of damages. We find no error in any of the interlocutory decrees, and they are all affirmed. We think that the final decree should be modified by striking out the paragraph numbered 4, which deals with the payment to the defendant of the future income of the $50,000 trust. The present decision will probably prevent controversy as to future income. *Whitney* v. *Whitney*, 316 Mass. 367, 370. As so modified, the final decree is

*Affirmed.*